UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

THOMAS NEWSOME,

                              Plaintiff,

vs.                                                          18-CV-6756 CJS
                                                             DECISION and ORDER
POLICE OFFICER J. MILLER, Ogden
Police Department, NICKOLAS ROMERO,
Police Officer, Rochester Police
Department, BRADLEY PIKE, Police
Officer, Rochester Police Department,
KRISTEN TREWER, Police Officer,
Rochester Police Department,

                              Defendants.

———————————————————————

INTRODUCTION

Thomas Newsome ("Plaintiff"), proceeding *pro se*, commenced this action under 42 U.S.C. § 1983 alleging that Defendants violated several of his federal constitutional rights in connection with an arrest and prosecution in 2014.  The sole remaining claim is for "malicious prosecution" in violation of Plaintiff's rights under the Fourth Amendment.[1]  Now before the Court are Defendants' motions for summary judgment. (ECF Nos. 42 & 43).  For the reasons discussed below, the motions are granted, and this action is dismissed.

PLAINTIFF'S *PRO SE* STATUS

Since Plaintiff is proceeding *pro se,* the Court has construed his submissions liberally to raise the strongest arguments that they suggest. *See, e.g., Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[T]he pleadings of a *pro se* plaintiff must be read liberally and should be

---

[1] *See*, Order, ECF No. 6 at pp. 1-2, 7.

interpreted 'to raise the strongest arguments that they suggest.'" *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994)."). Additionally, since "a *pro se* party must be given express notice of the consequences of failing to respond appropriately to a motion for summary judgment," *Capogrosso v. Lecrichia*, No. 07 CIV. 2722 (BSJ), 2010 WL 2076962, at *4 (S.D.N.Y. May 24, 2010) (citing *Irby v. New York City Transit Auth.*, 262 F.3d 412, 413–14 (2d Cir.2001)), Defendants have each served on Plaintiff, along with their moving papers, a copy of the "Notice to *Pro Se* Litigants" that is required by Rule 56(b) of the Local Rules of Civil Procedure.[2]

## GENERAL PRINCIPLES APPLICABLE TO RULE 56 MOTIONS

Defendants have moved for summary judgment, pursuant to Fed. R. Civ. P. 56, which may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant may satisfy this burden by pointing to an absence of evidence to support an essential element of the nonmoving party's claim." *Gummo v. Village of Depew*,

---

[2] The Court's form Rule 56 "Notice to *Pro Se* Litigants" states, in pertinent part, that facts contained in the movants' statements of facts will be deemed admitted unless the non-movant controverts them in his opposition papers: "You MUST also submit a separate, short, and concise statement of the material facts as to which you contend there exists a genuine issue which must be tried. See Rule 56 of the Local Rules of Civil Procedure (available on the Western District web site at www.nywd.uscourts.gov). Note that all of the material facts which have been set forth in the statement served on you by the moving party (which that party claims are material facts about which there is no genuine issue to be tried) will be deemed to have been admitted by you unless you controvert the facts in your statement of material facts presenting a genuine issue requiring a trial." (emphasis in original).

75 F.3d 98, 107 (2d Cir.1996) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)), *cert denied*, 517 U.S. 1190 (1996).

The burden then shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).[3] To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249.  The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962).  Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993).

SECTION 1983 STANDARDS

Plaintiff asserts a claim under 42 U.S.C. § 1983, and the legal principles generally applicable to such claims are well settled:

> In order to establish individual liability under § 1983, a plaintiff must show (a) that the defendant is a "person" acting "under the color of state law," and (b) that the defendant caused the plaintiff to be deprived of a federal right.

*Back v. Hastings On Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir.2004) (citation omitted); *see also*, *Oparaji v. City of New York*, 152 F.3d 920 (2d Cir. 1998) ("To state a claim under § 1983, a plaintiff must allege that the defendants, acting under color of state law, deprived

---

[3] "The substantive law governing the case will identify those facts which are material and 'only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)." *Heard v. City of New York*, 319 F.Supp.3d 687, 692 (S.D.N.Y. 2018).

him of a constitutional right. *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982).").

"A defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority.  Rather, the defendant's personal involvement in the alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir. 2016) (citations and internal quotation marks omitted), as amended (Feb. 24, 2016).  Consequently, where a plaintiff has sued multiple defendants, he must demonstrate that each defendant was personally involved in the alleged constitutional violation. *Cf., Chavis v. Korobkova*, No. 19 CV 83 (VB), 2020 WL 1233572, at *5 (S.D.N.Y. Mar. 13, 2020) ("A plaintiff cannot lump all the defendants together in each claim and provide no factual basis to distinguish their conduct.  Rather, a plaintiff must plead each defendant's personal involvement in an alleged constitutional violation.") (citation and internal quotation marks omitted).

Additionally, to sue a municipal defendant under Section 1983 for a constitutional violation committed by a municipal employee, a plaintiff cannot rely on *respondeat superior* vicarious liability, and must instead allege a basis for "*Monell*" liability against the municipality itself:

> To plead a *Monell* claim, a plaintiff must allege [(1)] the existence of a formal policy which is officially endorsed by the municipality, or [(2)] a practice so persistent and widespread that it constitutes a custom or usage of which supervisory authorities must have been aware, or [(3)] that a municipal custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials to such abuses.

*Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x at 13.  "The inference that a [municipal] policy existed may . . . be drawn from circumstantial proof[.]" *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991).  A claim against a municipal employee in his official capacity is the equivalent of a claim against the municipal employer. *See, Lore v. City of Syracuse*, 670 F.3d

127, 164 (2d Cir. 2012) ("A claim asserted against an individual in his official capacity, on the other hand, is in effect a claim against the governmental entity itself, rather than a suit against the individual personally, for 'official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent,' *Monell v. Department of Social Services*, 436 U.S. 658, 691 n. 55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).").

Plaintiff here is alleging a Section 1983 claim for malicious prosecution in violation of his Fourth Amendment rights.  In that regard,

> [Section] 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred. . . .  [For example, i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.  The validity of the claim must then be judged by reference to the specific constitutional standard which governs that right.

*Graham v. Connor*, 490 U.S. 386, 393–94, 109 S. Ct. 1865, 1870–71, 104 L. Ed. 2d 443 (1989) (citations omitted).  "To state a § 1983 malicious prosecution claim a plaintiff must show a violation of his rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law." *Friend v. Gasparino*, 61 F.4th 77, 85 (2d Cir. 2023) (quoting *Cornelio v. Connecticut*, 32 F.4th 160, 178 (2d Cir. 2022) (internal quotation marks omitted)).

> "To prevail on a malicious prosecution claim under New York law and federal law, a plaintiff must show: (1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff,[4] (2) the termination of the

---

[4] For purposes of a malicious prosecution claim under Section 1983 and New York State law, "[t]o initiate a prosecution, a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.  A jury may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors." *Manganiello v. City of New York*, 612 F.3d 149, 163 (2d Cir. 2010) (citations and internal quotation marks omitted); *see also, Manganiello v. Agostini*, No. 07 CIV.3644 HB, 2008 WL 5159776, at *5 (S.D.N.Y. Dec. 9, 2008) ("Manganiello was required to prove that Agostini played an active role in the prosecution, which could include giving advice, encouraging the authorities to act, filing criminal charges

proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding and (4) actual malice." *Kee v. City of New York*, 12 F.4th 150, 161-62 (2d Cir. 2021) (internal quotation marks omitted). We have explained in this context that "malice does not have to be actual spite or hatred, but means only 'that the defendant must have commenced the criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.'" *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) (quoting *Nardelli v. Stamberg*, 44 N.Y.2d 500, 502-03 (1978)).

*Franco v. Gunsalus*, No. 22-339, 2023 WL 3590102, at *4 (2d Cir. May 23, 2023).

The existence of probable cause for a criminal charge is a complete defense to a claim of malicious prosecution involving that specific charge:

> "Probable cause to prosecute is a complete defense to a claim of malicious prosecution ... [but] 'such probable cause must be shown as to each crime charged in the underlying criminal action.'" *Kee v. City of New York*, 12 F.4th 150, 166 (2d Cir. 2021) (citation omitted). Probable cause exists when "the arresting officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Mitchell v. City of New York*, 841 F.3d 72, 77 (2d Cir. 2016) (cleaned up). If probable cause existed at the time of an arrest, it continues to exist at the time of prosecution unless it is undermined "by the discovery of some intervening fact." *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003).

*Malarczyk v. Lovgren*, No. 22-504, 2023 WL 8073099, at *2 (2d Cir. Nov. 21, 2023); *see also, Keyes v. City of New York*, No. 21-2406-CV, 2023 WL 176956, at *4 (2d Cir. Jan. 13, 2023) ("For purposes of malicious prosecution, probable cause is assessed in light of the facts known or reasonably believed by the officers at the initiation of the prosecution, not the arrest.  However, if the officers had probable cause to arrest the plaintiff, a suspect, there can be no claim for

---

against the plaintiff, being instrumental in bringing about the criminal charges, or providing false information to the prosecutors.") (citations omitted), *aff'd sub nom. Manganiello v. City of New York*, 612 F.3d 149 (2d Cir. 2010).

malicious prosecution unless facts emerge following the arrest showing that the charges against the suspect are groundless.") (citation omitted).

It is well settled that, "police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed," and "are also entitled to rely on the allegations of fellow police officers." *Martinez v. Simonetti*, 202 F.3d 625, 634 (2d Cir. 2000) (citations omitted); *see also, id*. at 635 ("It is not unreasonable for police officers to rely on the accounts provided by other officers at the scene, even when confronted with conflicting accounts.").

As will be discussed further below, Plaintiff here was indicted and tried on the subject felony charges,[5] which is significant since, in a malicious prosecution action, an indictment creates a rebuttable presumption that there was probable cause for a prosecution:

> Under New York law, "[t]he existence of probable cause is a complete defense to a claim of malicious prosecution." *Dufort v. City of New York*, 874 F.3d 338, 351 (2d Cir. 2017) (internal quotation marks omitted). A grand jury indictment "creates a presumption that [a criminal defendant's] arrest and indictment were procured with probable cause." *Bernard v. United States*, 25 F.3d 98, 104 (2d Cir. 1994). "To rebut this presumption, the plaintiff 'must establish that the indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Id*. (quoting *Colon v. City of New York*, 455 N.E.2d 1248, 1251 (N.Y. 1983)). Thus, where a plaintiff was indicted by a grand jury, summary judgment in the defendants' favor is appropriate if the plaintiff fails to provide evidence from which a reasonable jury could infer that the defendants committed fraud or perjury, suppressed evidence, or otherwise acted in bad faith to procure the plaintiff's indictment by a preponderance of the evidence—the plaintiff's burden

---

[5] The record does not include the Indictment, but the fact that Plaintiff was acquitted after trial on felony charges indicates that there was an indictment. *See, People v. England*, 84 N.Y.2d 1, 4–5, 636 N.E.2d 1387, 1389–90 (1994) ("Defendant could not have been brought to trial before arraignment, the process by which the court acquires jurisdiction over a defendant (CPL 1.20[9]). That is an elemental prerequisite to trial readiness. Here, the undisturbed factual finding is that the long delay was directly attributable not to defendant or court congestion, but to the People's laxity in securing an indictment that provided a jurisdictional basis for the court to act at all."); *see also, People v. Davis*, 82 Misc. 3d 1243(A), 209 N.Y.S.3d 725 (N.Y. Sup. Ct. 2023) ("[A] defendant cannot be brought to trial on a felony offense before arraignment on an indictment, as it is an elemental prerequisite to trial readiness (cf. CPL § 1.20 [3]).").

of proof in a civil action. *See Barr Rubber Prods. Co. v. Sun Rubber Co.*, 425 F.2d 1114, 1120 (2d Cir. 1970).

*Thorpe v. Duve*, No. 20-3679-CV, 2022 WL 332804, at *1 (2d Cir. Feb. 4, 2022) (emphasis added); *see also, Rothstein v. Carriere*, 373 F.3d 275, 282–83 (2d Cir. 2004) ("The presumption [of probable cause arising from an indictment] may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.") (citations and internal quotation marks omitted).

## FACTUAL BACKGROUND

Unless otherwise noted, the following are the undisputed facts, viewed in the light most-favorable to Plaintiff.[6]   At all relevant times, defendant J. Miller ("Miller") was employed as a police officer by the Town of Ogden Police Department ("OPD"), and defendants Nickolas Romero ("Romero"), Bradley Pike ("Pike"), and Kristen Trewer ("Trewer") were employed as police officers by the City of Rochester Police Department ("RPD").   At all relevant times, Plaintiff resided at 820 East Main Street, Apartment 8, Rochester, New York, located on the second-floor ("the apartment").   At all times relevant to this action, Tanisha Nealy ("Nealy"), a female friend of Plaintiff, also occupied the apartment.   In that regard, defendants Miller, Pike, and Romero were

---

[6] Plaintiff's papers provide only a small amount of background information.   Consequently, most of the facts concerning the police investigation and arrest are taken from the police reports contained in Defendant's Initial Rule 26 Disclosure (ECF No. 18). *See, e.g., D.R. by Rodriguez v. Santos Bakery, Inc.*, 675 F. Supp. 3d 355, 360 (S.D.N.Y. 2023) ("Generally speaking, a police report is admissible as an exception to the hearsay rule as either a business record under Federal Rule of Evidence 803(6) or as a public record under Federal Rule of Evidence 803(8).") (citations omitted); *see also, Guerrero v. City of Yonkers*, No. 18CV5353NGGRER, 2023 WL 6141604, at *3 (E.D.N.Y. Sept. 20, 2023) ("Third-party statements contained in police reports may raise hearsay issues if offered for the truth of the matter asserted, though not where they are offered for the purpose of establishing whether there was probable cause for an arrest.").

told by other residents of the apartment building that Nealy regularly resided in Apartment 8 along with her child, while Plaintiff insists that Nealy merely stayed there occasionally.

On the morning of November 22, 2014, a male resident of the Town of Ogden made a complaint to the OPD that Nealy had stolen firearms and other items from his residence.  More specifically, the complainant indicated that the prior evening he had picked up Nealy at 820 East Main Street, Apartment 8, in the City of Rochester, and driven her to his residence in Ogden, where the two drank alcohol and smoked marijuana.  The complainant indicated that he fell asleep in the early morning hours, and awoke to find himself alone, with his apartment door wide open and the following items of his property missing: A 46" television; an iphone; five shotguns; and a blanket/bedspread.  The complainant estimated that the stolen property was worth about four thousand dollars.  The complainant noted that Nealy had left behind some of her jewelry and items of clothing.  The complainant indicated that he knew Nealy worked as a prostitute, and that she had an outstanding arrest warrant for a violation of probation.

Defendant officer Miller took the complainant's statement and then traveled to 820 East Main Street in Rochester to attempt to question Nealy.  Upon arriving in Rochester, Miller met with defendant RPD officers Romero and Pike, who had been dispatched there to assist him. The officers determined that Nealy had two outstanding arrest warrants from the City of Rochester for violations of probation.   The officers knocked on the door of Apartment 8 but received no response.  As the officers stood outside the apartment door, other residents of the building told them that they knew Nealy was inside the apartment, since they had seen her a few minutes earlier.  Officers Miller and Pike then went upstairs to locate the apartment building's superintendent, who lived on the third floor.  Miller maintains that as he and Pike walked up a stairwell, they observed that Nealy, whom they recognized from a prior booking photo, was

entering the stairwell through a window adjacent to the building's fire escape, and that a male, later identified as Plaintiff, was also on the fire escape and fled after seeing the officers.[7]  Miller indicates that he took Nealy into custody while Pike and Romero pursued Plaintiff.  Miller further indicates that in response to his questioning, Nealy admitted to him that she knew the officers were there concerning the incident in Ogden, and that all the property stolen from the Ogden residence was inside Apartment 8.

Officer Romero indicates that he chased after Plaintiff, who used the fire escape to enter the window of an apartment, later determined to be Apartment 8.   Romero entered the apartment through the same window and observed the stolen long guns and television inside the apartment, near the entrance door.  Romero also observed a loaded 9mm handgun on a shelf inside the apartment.  Officer Pike, who by this time was outside the apartment building, indicates that a few moments later he observed Plaintiff jump out a different second-floor window to the ground, and begin to run away, after which Pike took him into custody.

Plaintiff generally agrees with this description of what took place at the apartment building up to this point, though he adamantly insists that he was never "on" the fire escape.  Rather, Plaintiff states that he merely leaned out the apartment window over the fire escape, but then went back inside the apartment and leaped out of different second-floor window, landing on the ground with minor injuries.  Plaintiff insists that he was not attempting to flee from the police when he jumped from the window, and claims that he thought he was escaping from a home invasion robbery.  In that regard, Plaintiff maintains that he saw several "persons in dark clothing"

---

[7] It is reasonable to infer from this that Nealy and Plaintiff had exited Apartment 8 using the fire escape, in order to evade the officers.

with guns, but failed to recognize that they were police officers, despite the fact that this occurred in broad daylight.[8]

The officers brought Nealy to Apartment 8, where she gave verbal consent, and, later, written consent, to search the apartment.  The officers also had some discussion with Nealy, in which she indicated that she had previously seen Plaintiff in possession of the 9mm handgun. The officers then brought Plaintiff to Apartment 8, where he also signed a written consent-to-search form.  Both Nealy and Plaintiff separately told the officers that they lived in Apartment 8, though Plaintiff told the officers that it was his apartment and not Nealy's.  The officers then conducted a search of the apartment, in which defendant Trewer also participated, which, in addition to the property stolen from the Ogden residence and the loaded 9mm handgun, also uncovered drug paraphernalia.

Plaintiff again generally agrees with these facts, concerning what occurred inside the apartment, but maintains that the officers tricked him into giving written consent for the search by falsely telling him that they were really just interested in prosecuting Nealy and recovering the stolen property.  Additionally, Plaintiff, despite his very lengthy rap sheet, claims that he did not understand what he was signing.  Plaintiff indicates that as soon as he signed the consent form, the officers told him, in Nealy's presence, that they had found the handgun, which was not one of the items reported stolen from the Ogden residence, and that Nealy had told them that the

---

[8] *See, e.g.*, Plaintiff's Deposition, ECF No. 42-3 at p. 54 ("And when I looked down, I couldn't tell who it was.  I just noticed someone in dark-colored clothes and they was like standing in a the shooting position[.]"). Plaintiff's bald assertions, that he did not recognize that Defendants were police officers and that he was not attempting to evade Defendants when he jumped out of the window, are arguably the type of patently implausible statements that no reasonable juror would believe, and which the Court would therefore not be required to accept as true when deciding the pending summary judgment motions. *See, Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) ("Because no reasonable person would undertake the suspension of disbelief necessary to give credit to the allegations made in the complaint, we conclude that summary judgment was appropriate.") (citation omitted).  However, the Court need not decide that issue since, even accepting those assertions as true, they do not demonstrate a lack of probable cause or otherwise raise a triable issue of fact.

gun was his.  Plaintiff contends that in response to such statement, Nealy declared that she had only told the officers that because they had pressured her to do so.  In that regard, both Nealy and Plaintiff had prior felony convictions, and it would have been unlawful for either of them to possess a firearm.  Nevertheless, regardless of her reasons for doing so, it is undisputed that Nealy told the officers that the handgun belonged to Plaintiff.

The officers recovered the stolen shotguns and television from the apartment.  Plaintiff, however, denies that he knew the stolen property was there, and maintains that he was sleeping before the police arrived, and that Nealy must have brought the property into the apartment while he was asleep.  However, an RPD technician processed the scene for evidence and found, on the stolen television, a fingerprint that was later matched to Plaintiff.

The officers subsequently transported Nealy and Plaintiff to the police station for questioning.  According to the police reports, Nealy admitted that she had been at the Ogen residence during the prior night and early morning, and that she had telephoned Plaintiff for a ride after the resident had fallen asleep.  Nealy indicated that Plaintiff, along with another male whom she did not know, later arrived at the residence, whereupon she went to Plaintiff's car while the unknown male removed the shotguns and television from the residence and placed them in Plaintiff's car.  Nealy indicated that she later helped Plaintiff carry the stolen property into Apartment 8.

The officers' reports concerning their interview of Plaintiff, meanwhile, indicate that he denied ever being at the Ogden residence, but admitted that he had handled the stolen shotguns after someone else had brought them to his apartment.  Indeed, the reports indicate that Plaintiff told the officers that they would find his fingerprints "all over" the stolen long guns and television. The reports further indicate that when Plaintiff was asked about the handgun, he initially stated

that it was brought to the apartment by a third party, along with the stolen shotguns, but that he later stated that he had been keeping the handgun for a friend.  Plaintiff does not expressly dispute most of what is contained in the report of his interview, though he more generally maintains his innocence and denies that he ever told the officers that he was holding the handgun for someone else.[9]

The officers subsequently filed criminal charges against Nealy and Plaintiff.  More specifically, in Ogden Town Court, Miller filed felony complaints against Plaintiff and Nealy, charging them with, respectively, five counts of Grand Larceny in the Fourth Degree, PL § 155.30(7), relating to theft of property consisting of firearms, rifles or shotguns, and one count of Grand Larceny in the Third Degree, PL § 155.35(1), relating to theft of property with a value exceeding three thousand dollars.   Meanwhile, in Rochester City Court, Romero and Pike charged Plaintiff and Nealy each with Criminal Possession of a Weapon in the Third Degree, PL § 265.02(1), relating to the loaded handgun, and Criminal Possession of Stolen Property in the Fourth Degree, PL § 165.45, relating to possession of the stolen shotguns.  Romero and Pike also charged Plaintiff with Criminal Possession of a Weapon in the Fourth Degree, PL § 265.01(4), relating to possession of the shotguns after having been convicted of a felony  (ECF No. 18 at pp. 19, 50-53), and Plaintiff was later indicted on those same charges by a Monroe County Grand Jury.

Plaintiff maintains that while he was awaiting trial, Nealy contacted him and told him that she planned to testify against him as part of a plea bargain that her attorney had reached with the Monroe County District Attorney's Office.  According to Plaintiff, Nealy told him that she had tried to convince the prosecutors that he was innocent, but that they had indicated they wanted

---

[9] Plaintiff's Deposition, ECF No. 42-3 at p. 98.

to prosecute him even though they knew him to be innocent, and that consequently she intended to testify falsely against him since she wanted to obtain the benefit of the plea bargain.

In or about April 16, 2016, there was a jury trial, at which Nealy testified against Plaintiff as part of a plea agreement that she had made with the Office of the District Attorney. Indeed, Plaintiff indicates that Nealy was the prosecution's "star witness" against him.[10] Plaintiff maintains that Pike, Romero, and Trewer also testified against him at the trial, but does not recall whether Miller testified.[11] The jury acquitted Plaintiff of all charges.

Plaintiff subsequently commenced the instant action. Plaintiff's original Complaint purported to assert claims under Section 1983 against various individuals, including the Town of Ogden Mayor, the Town of Ogden Police Chief, the City of Rochester Mayor, the City of Rochester Police Chief, and numerous "John Doe" police officers, for false arrest and malicious prosecution. The gist of the Complaint was that the police officers had tricked Plaintiff into cooperating with them, by making him believe that they were only interested in arresting Nealy, and that the officers had pressured Nealy into falsely saying that the handgun belonged to Plaintiff. The Complaint insisted that any crimes were committed by Nealy, and that even though Nealy told the officers that Plaintiff was not involved, they framed him for her crimes, because they believed that he had evaded prosecution for other crimes. The Court screened the Complaint pursuant to 28 U.S.C. § § 1915(e)(2)(B) & 1915A and ordered that the action would be dismissed unless Plaintiff filed an amended pleading. (ECF No. 3).

Plaintiff subsequently filed an Amended Complaint against just Miller, Romero, Pike, and Trewer, asserting claims under Section 1983 for conspiracy and malicious prosecution. The

---

[10] Plaintiff's Deposition, ECF No. 42-3 at p. 105.

[11] Plaintiff's Deposition at pp. 82-83.

amended pleading maintains that Plaintiff had no involvement in any wrongdoing by Nealy; that Defendants tricked Plaintiff into cooperating with them and consenting to a search of his apartment; that Defendants coerced Nealy into falsely saying that the handgun belonged to Plaintiff; and that Defendants essentially used Nealy to frame him as "'payback' for the crimes they could not catch him for in the past."[12]  The pleading alleged that Defendants conspired with unnamed members of the Monroe County District Attorney's Office to prosecute Plaintiff, even though they all knew he was innocent.  The Court screened the Amended Complaint and dismissed all claims except the claim for malicious prosecution.

During Plaintiff's deposition, he indicated that the defendant officers had made false statements in their reports.  When asked to specify which statements were false, Plaintiff identified two statements from the investigatory reports:  First, the statement that Plaintiff had been "running on the fire escape"; and second, the statement that Plaintiff had admitted holding the handgun for someone else.[13]

Following the completion of pretrial discovery, Defendants filed the subject motions for summary judgment.  Defendants essentially contend that Plaintiff cannot prevail on his malicious prosecution claim, since there was probable cause for the prosecution.   On this point, Defendants maintain primarily that Plaintiff has not rebutted the presumption of probable cause that arises from his Indictment.   Defendants argue, rather, that Plaintiff's claim that they pressured Nealy into falsely testifying against him is based only on hearsay and conclusory assertions.

---

[12] Amended Complaint at ¶ 29; *see also, id.* at ¶ 32 ("Pike and Romeo repeatedly stated that they knew he was not involved with this particular crime, but that they were seizing this opportunity to get rid of him off the streets.").

[13] Plaintiff's Deposition at pp. 97, 104-105.

As mentioned earlier, Plaintiff never responded to Defendants' motions.

DISCUSSION

The Court notes preliminarily that even though Plaintiff did not file any response to Defendants' motions (even after being served with Defendants' *Irby* notices), the Court cannot simply grant judgment to Defendants by default. *See, Hastad v. Hippos In Tanks, LLC*, No. 17-CV-2518 (VEC), 2019 WL 1228076, at *4 (S.D.N.Y. Mar. 15, 2019)  ("[B]ecause 'summary judgment cannot be granted by default even if there is a complete failure to respond to the motion,' Fed. R. Civ. P. 56, Advisory Committee Note (2010), the Court must independently consider whether Plaintiff has met his burden for summary judgment. *See Vt. Teddy Bear Co. v. 1-800 Beargram Co*., 373 F.3d 241, 242 (2d Cir. 2004) ("Even when a motion for summary judgment is unopposed, the district court is not relieved of its duty to decide whether the movant is entitled to judgment as a matter of law.").

Instead, the Court has considered the entire record, including Plaintiff's deposition transcript and verified pleadings. *See*, *Patterson v. Cnty. of Oneida*, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) ("[A] verified pleading, to the extent that it makes allegations on the basis of the plaintiff's personal knowledge, and not merely on information and belief, has the effect of an affidavit and may be relied on to oppose summary judgment."); *see also, Aramas v. Polizzi*, No. 18-CV-4106 (KMK), 2022 WL 1597696, at *1, n. 2 (S.D.N.Y. May 19, 2022) ("Although a plaintiff's *pro se* status does not allow him to rely on conclusory allegations or unsubstantiated speculation to overcome a motion for summary judgment, where a plaintiff verifies his complaint by attesting under penalty of perjury that the statements in the complaint are true to the best of his knowledge, the verified complaint is to be treated as an affidavit for summary judgment purposes.") (collecting cases; internal citations and quotation marks omitted).  However, even

16

liberally construing such documents, Plaintiff has not raised any triable issue of fact to defeat summary judgment.

At the outset, the Court notes that Defendants are entitled to summary judgment on the official-capacity claims, which are really claims against the Town of Ogden and the City of Rochester.  On this point, even assuming *arguendo* that Plaintiff had raised a triable issue of fact as to whether the defendants, in their individual capacities, violated his federal constitutional rights, he has not demonstrated any basis to impose *Monell* liability on the Town of Ogden or the City of Rochester.  That is, he has not come forward with any evidence that any alleged constitutional violation by Miller, Romero, Pike, or Trewer, was committed pursuant to a municipal policy or custom of the Town of Ogden or of the City of Rochester.

Nor has Plaintiff raised a triable issue of fact concerning the liability of the defendant officers in their individual capacities.  More specifically, Plaintiff has not rebutted the presumption of probable cause arising from his indictment by coming forward with some evidence that Defendants committed fraud or perjury, suppressed evidence, or otherwise acted in bad faith to procure the indictment.[14]  Plaintiff does not, for example, dispute that the television and shotguns were stolen from the Ogden residence; that the same stolen property was found in his apartment a few hours later; that Nealy told Defendants that she had witnessed him and another man commit the theft; that the handgun was found in his apartment;  or that Nealy testified under oath at trial that she witnessed him commit the theft and possess the handgun.  Nor does Plaintiff

---

[14]It appears undisputed that Plaintiff was indicted on the charges filed by Pike and Romero.  It is less clear whether Plaintiff was ever indicted for the charges filed separately by Miller in Ogden Court.  However, even if he was not, the Court finds that it is clear from the record that Miller had probable cause to pursue those charges.  Indeed, the primary focus of Plaintiff's action appears to be the charge related to possession of the handgun, with which Miller was not involved.

attempt to argue that this information was insufficient as a matter of law to provide Defendants with probable cause to prosecute him.

Instead, Plaintiff baldly asserts that he is innocent of any wrongdoing, and that he was the victim of a wide-ranging conspiracy between the police and prosecutors to use Nealy to frame him.  However, Plaintiff has no firsthand knowledge of any such conspiracy.  Instead, he relies mostly on vague and conclusory hearsay statements as to what Nealy allegedly told him about her alleged conversations with police and prosecutors, which are inadmissible and insufficient to raise a triable issue of fact. *See, Debrosse v. City of New York*, 739 F. App'x 48, 50 (2d Cir. 2018) ("[A] malicious prosecution plaintiff's 'mere conjecture and surmise' are insufficient to overcome the presumption of probable cause resulting from the indictment.") (citation omitted); *see also, id*. ("[W]e agree that Debrosse failed to rebut the presumption of probable cause. That is, aside from offering conclusory allegations and unsubstantiated speculation, Debrosse has not met his burden of producing admissible evidence from which a reasonable juror could infer that the indictment was the product of fraud, perjury, the suppression of evidence by the police, or other police conduct undertaken in bad faith.  . . .  Nor does any of the inadmissible hearsay deposition testimony of Williams's father (recounting what his daughter told him) or the victim, Peter Daleus, (relaying Williams's statements, including her statements about what the police told her) defeat summary judgment, since the court may consider only admissible evidence.") (citation and internal quotation marks omitted); *Jessamy v. Jakasal*, No. 21-214, 2022 WL 1669512, at *2 (2d Cir. May 26, 2022) ("Jessamy has not offered any evidence, aside from his own speculation, that the grand jury indictment was procured by fraud, perjury, suppression of evidence, or bad faith. Unsubstantiated speculation, however, cannot defeat a motion for summary judgment.") (citation and internal quotation marks omitted).

Plaintiff does, however, include in his sworn Amended Complaint a statement that would be admissible as an admission against defendants Romero, Pike, and Miller, as follows:

> PIKE and ROMERO repeatedly stated [during the interview] that they knew he was not involved with this particular crime, but that they were seizing this opportunity to get rid of him off of the streets.  PIKE, ROMERO and MILLER stated that they would be sure they convinced NEALY to make statements against plaintiff, and that he should just cooperate with them, and admit that they finally "defeated" him.

Amended Complaint at ¶ ¶ 32-33.  However, this contention also fails to raise a triable issue of fact.[15]

In this regard, the Court notes, preliminarily, that this assertion in the pleading is inconsistent with Plaintiff's sworn deposition testimony, in which he failed to mention such statements despite having been asked to state in detail what occurred during the interview.  For example, Miller's counsel expressly asked Plaintiff, what, if anything, Miller had said during the interview at the police station, and Plaintiff never mentioned such a statement.  Rather, Plaintiff indicated that Miller said almost nothing during the interview.[16]  Additionally, counsel asked Plaintiff to specifically state what Miller had done that was improper, and Plaintiff identified only two things:  First, that he incorrectly stated that Plaintiff had been on the fire escape, and, second, that he persuaded Plaintiff to sign the consent-to-search form by falsely telling him that he "did not have anything to worry about."  Similarly, at deposition Plaintiff never testified that Romero or Pike stated that that they knew he "was not involved in this particular crime."  Rather, Plaintiff testified that Romero and Pike told him that they *had evidence* to charge him for the

---

[15] In addition to the other reasons discussed below, the subject admission does not in any way implicate defendant Trewer in any wrongdoing.  Indeed, the record is largely devoid of any mention of Trewer, and certainly does not support a malicious prosecution claim against her.

[16] See, e.g., Pl. Deposition at p. 72 ("The second time I said it [asking for an attorney], Miller didn't say anything else after that.  At some point I believe he left.").

crimes involving the Ogden property and the handgun, but that they were *more interested* in what he could tell them about other crimes and other persons about which he might have information. *See, e.g.*, Pl. Deposition at pp. 70-71 ("Q. And sir, when the officers came in, what did they talk to you about?  A. It was a lot of – it was a lot of talk about her.  They got her as a witness to testify against me for the Ogden situation, having a gun in the apartment, other crimes, but they were not concerned about this particular crime, [and that] I should confess to all the crimes and tell them my crew."); *see also, id*. at p. 72 (Plaintiff testified that Pike and Romero told him that they had caught him "red handed.").

Besides, this alleged admission by Miller, Romero and Pike does not raise a triable issue of fact as to probable cause in any event, since at most it shows that the officers subjectively believed that Plaintiff was innocent of the charges which they later filed.   However, the Defendants' subjective beliefs on that point are irrelevant, since the existence of probable cause is an objective determination. *See, e.g., Roberts v. Azize*, 767 F. App'x 196, 198 (2d Cir. 2019) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Devenpeck v. Alford*, 543 U.S. 146, 152, 125 S.Ct. 588, 160 L.Ed.2d 537 (2004). This inquiry is an objective one: "an arresting officer's state of mind (*except for the facts that he knows*) is irrelevant to the existence of probable cause." *Id*. at 153, 125 S.Ct. 588 (emphasis added)."); *see also, Nzegwu v. Friedman*, 605 F. App'x 27, 30 (2d Cir. 2015) ("[T]he state of mind of the arresting officer—that is, his subjective reason for believing there to be probable cause to arrest—is irrelevant to the probable cause determination, even if the officer's subjective reason is foolish or based on improper factors.  For this reason, Nzegwu's allegations that Defendants arrested him, at least in part, because of his national origin and race, are irrelevant to the legal inquiry: they go to the officers'

subjective reason for arresting him, not to the facts before Defendants at the time of his arrest.")

(citation omitted).

Here, the facts that were available to Defendants at the time they arrested Plaintiff objectively established probable cause, and nothing that subsequently occurred caused that probable cause to dissipate. Rather, the level of probable cause only increased, since as mentioned earlier, the police later confirmed that Plaintiff's fingerprint was on the stolen television. *See, Moore v. City of New York*, 854 F. App'x 397, 399 (2d Cir. 2021) ("Although probable cause may dissipate after an arrest if the groundless nature of the charges is made apparent by the discovery of some intervening fact, Moore does not identify any evidence indicating that the appellees had knowledge of some intervening fact exonerating him.") (citations and internal quotation marks omitted). Defendants are therefore entitled to judgment.

## CONCLUSION

For the reasons discussed above, Defendants' Motions for Summary Judgment (ECF Nos. 42 & 43) are granted. The Clerk is directed to enter judgment for Defendants and to close this action. The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

*Charles J. Siragusa*

CHARLES J. SIRAGUSA
United States District Judge

DATED: July 15, 2024
Rochester, New York